UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

BLAZE ROBERT DOWNEY,

Plaintiff,

v.                                    CASE NO. 3:21-CV-131-SJF

WILLIAM HYATTE,

Defendant.

**OPINION and ORDER**

Plaintiff Blaze Robert Downey filed this case *pro se* on February 26, 2021. The Court screened his complaint under 28 U.S.C. § 1915A to determine whether his case was frivolous or malicious, failed to state a claim upon which relief may be granted, or sought monetary relief against a defendant who is immune from such relief. On April 1, 2021, Mr. Downey was granted leave to proceed on a claim against the Warden of the Miami Correctional Facility ("MCF"), William Hyatte, for failing to protect him from attacks by other inmates that occurred in March and August 2020. [*See* DE 7]. On March 16, 2022, the parties consented to the jurisdiction of the magistrate judge under 28 U.S.C. § 636(c). [DE 48].

The case progressed with Mr. Downey *pro se* until May 18, 2023. On that date, Attorney Charles C. Hayes appeared on behalf of Mr. Downey. [*See* DE 86]. Five months thereafter, William Hyatte (hereinafter, "Warden Hyatte" or "the Warden") moved for summary judgment. Mr. Downey, through counsel, responded on November 13, 2023, and the Warden filed his reply in support of summary judgment on

December 4, 2023. Mr. Downey then moved to amend his response on February 23, 2024, so that it complied with this Court's local rules. [DE 106]. While these motions were pending, the case was reassigned to the undersigned magistrate judge on August 13, 2024, and the parties did not object to the continued exercise of jurisdiction by the undersigned. [*See* DE 107].

Accordingly, the Court now considers the following two motions: Defendant Warden Hyatte's Motion for Summary Judgment [DE 97] and Mr. Downey's Unopposed Motion for Leave to Amend his Response to Defendant's Motion for Summary Judgment [DE 106]. The Court considers Mr. Downey's unopposed motion first.

## I.   Mr. Downey's Unopposed Motion for Leave to Amend his Response to the Warden's Motion for Summary Judgment [DE 106]

As stated, Mr. Downey responded to Warden Hyatte's Motion for Summary Judgment on November 13, 2023. [DE 100]. The Warden did not object to the form of Mr. Downey's response. Still, on February 23, 2024, Mr. Downey sought the Court's leave to amend his response to the Warden's Motion for Summary Judgment so that his response complies with the requirements in this Court's local rules. Mr. Downey further reported that Warden Hyatte had no objection to his request to belatedly amend his response.

Under this Court's local rules, a party moving for summary judgment must separately file: (1) a motion; (2) a supporting brief; and (3) a statement of material facts with numbered paragraphs for each material fact the moving party contends is

2

undisputed which includes (A) a short statement of each fact; and (B) a citation to evidence supporting each fact. *See* N.D. Ind. L.R. 56-1(a). A party opposing summary judgment must separately file: (1) a response brief and (2) a Response to Statement of Material Facts that (A) restates verbatim the Statement of Facts, (B) a correspondingly numbered response immediately following each paragraph of the Statement of Facts, (C) a citation to evidence supporting each dispute of fact, and (D) additional facts in a section titled Additional Material Facts with numbered paragraphs continuing the sequential numbing of the Statement of Material Facts for each additional material fact the opposing party contends is undisputed which includes both (i) a short statement of each fact, and (ii) a citation to evidence supporting each fact. *See* N.D. Ind. L.R. 56-1(b).

As contemplated by Local Rule 56-1(a), the Warden separately filed his Motion for Summary Judgment, Memorandum in Support, and Statement of Material Facts on October 31, 2023. [DEs 97-99]. Mr. Downey then filed a combined Response and Statement of Facts on November 13, 2023. [DE 100]. Though his response included a Statement of Facts in the body of the filing, because he did not individually file a response brief and a Response to Statement of Facts, it failed to meet the requirements of the local rules. Moreover, Mr. Downey's fact sections did not restate verbatim the Warden's Statement of Material Facts, use corresponding numbers, or cite evidence for each fact, as required by the Court's local rules.

Through his motion to amend, Mr. Downey includes a proposed Response to Defendant's Statement of Material Facts and a Statement of Additional Facts consistent

with this Court's rules. Accordingly, because the motion resolves the deficiencies with his initial response, and with no objection, Mr. Downey's Motion for Leave to Amend His Response to Defendant's Motion for Summary Judgment is granted.

The Court now considers the Warden's motion.

## II.    Warden Hyatte's Motion for Summary Judgment [DE 97]

### A.    Background

The following facts are primarily not in dispute. For the purposes of this motion, any facts that are not addressed are taken as undisputed in accordance with Fed. R. Civ. P. 56(e)(2). When any disputes do exist, they are either immaterial or are addressed in the Court's substantive analysis of the issue.

Mr. Downey is an offender in the custody of the Indiana Department of Correction ("IDOC"). Mr. Downey is currently incarcerated at the New Castle Correctional Facility, but during the incidents at issue here, Mr. Downey was incarcerated at the Miami Correctional Facility ("MCF") in Bunker Hill, Indiana. [DE 106-2 at 1, ¶¶1, 1a]. William Hyatte was the Warden of MCF while Mr. Downey was housed there. [*Id.* ¶¶2, 2a].

As the warden of MCF, William Hyatte "is ultimately responsible for the management of the facility." [DE 106-2 at 4, ¶1]. Warden Hyatte was also responsible for final determinations regarding protective custody. [DE 100-1; MCF Policy #02-01-107]. MCF maintained an operational procedures manual regarding the use and

operation of protective custody.[1] [*Id.*]. According to this policy, an offender may request protective custody by contacting appropriate staff, who in turn will help the offender obtain and complete a Request for Protection, State Form 24308. [*Id.* at 2, ¶IIIA.] After an offender submits a request, it is reviewed by designated MCF staff. Staff review the request, as well as any relevant documents, and make a written recommendation within 24 hours of receipt. [*Id.* at 3, ¶III.B.2.a.(2)]. The Unit Team Manager will then forward the request form and any additional documentation to the Assistant Superintendent/Re-Entry, who will review it and forward it to the Warden[2] for final determination.

Mr. Downey alleges that Warden Hyatte failed to protect Mr. Downey from two attacks that occurred in 2020, both of which occurred after Mr. Downey submitted multiple Requests for Protection.

### 1.    First Attack – March 26, 2020

Mr. Downey states that he was first assaulted on March 26, 2020, when three or four people came into his cell with masks on and towels on their faces and proceeded to beat him severely. [DE 106-2 at 2, ¶¶12, 12a]. Prior to this attack, Mr. Downey submitted three Requests for Protective Custody using State Form 24308: one on October 2, 2019;

---

[1] In his deposition, the Warden stated that this policy did not apply to MCF because it did not have a Protective Custody Unit. [*See* DE 100-2 at 47, lines 8-15]. But the Warden does not make this argument on summary judgment. Moreover, the Court must construe the facts in the light most favorable to Mr. Downey and draw all reasonable inferences in his favor. *Heft v. Moore,* 351 F.3d 278, 282 (7th Cir. 2003). Accordingly, the Court will construe the policy as applicable as contended by Mr. Downey.

[2] The policy actually provides that the form is sent to the Superintendent, but Warden Hyatte clarified in his deposition that the warden is considered the equivalent of the superintendent in this circumstance. [*See* DE 100-2 at 6 lines 21-25; at 7 lines 1-4]. The Court has therefore substituted warden for ease of reference here.

another on October 26, 2019; and a third on December 30, 2019. [DEs 97-1, 97-2, and 97-3]. Mr. Downey believed that he needed protective custody because he almost died in 2015, and he knew that people and organizations were after him. [DE 106-2 at 2, ¶¶6, 6a].

In his October 2nd request, Mr. Downey reported that he "was [at MCF] in 2010 about. And was beaten by the Aryan BrotherHood and was put in the hospital. . . . The Reason I am wanted by the Aryans & [illegible] is due to some shit from county court staff. I just came from RDC and was on PC there . . . . Now Im here. There is a hit out on me." [DE 97-1 at 2]. Comments from MCF Staff on the request show that it was denied on October 4, 2019, because it did not contain specific information about a threat at the facility. MCF staff comments also note that Mr. Downey had yet to enter the facility when he submitted the request. [*See id.*]. An MCF caseworker sent an Inter-Departmental Memorandum to Warden Hyatte that same day. The Inter-Departmental Memorandum advised the Warden of Mr. Downey's request and reported that it had been denied because it failed to provide the specific information necessary to meet the requirements in MCF's Operational procedures for policy #02-01-107. [*See id.* at 1].

In his October 26th request, Mr. Downey stated "[t]here are people trying to fuck me up and hurt me try to burn me with [illegible] of liquid cause I locked my door." [DE 97-2 at 2]. Comments from MCF Staff on Mr. Downey's October 26th request show that it was denied on October 28, 2019, because he did not provide specific information to investigate. [*See id.*]. An MCF Unit Team Manager sent an Inter-Departmental

Memorandum to the Warden that same day, advising the Warden of the request. The Memorandum reported that Mr. Downey alleged threats but that he did not provide any specific information to investigate. The Memorandum concluded by stating that the request was denied. [*See id.* at 1].

In his December 30th request, consisting of two pages, Mr. Downey alleged

I have names and bed numbers also Two organizations Aryan BrotherHood & Folks GD's. Both have a Hit out on me to kill me. I've been in Protective Custody for this reason. I'm fear full for my life people keep callin my family demanding money due to my case and Here Extorting me and my family and they keep beeting on me then telling me if I go anywhere I will be killed Help. (I have full names and there Info) My family know about this I just called them The Name's of the people are "Aryan Oklahoma" E-house / Nickname
  (Tone) and Underwood
  Tone is GD's I have phone numbers also Transactions Numbers
  UnderWood Folks – I have phone number & names
  Ocklhoma – Aryan Brotherhood
    There gonna kill me
 I can not live on this Camp
  I've asked Many times

[DE 97-3 at 2-3]. Comments from MFC staff on the request show that, though certain interim action was taken in response, this request was ultimately denied on December 31, 2019. The first comment states: "Issue is not with current cellmate. Ofd. to remain in assigned cell and await further review by I&I and Unit Team. [signature illegible]." [*Id.* at 2]. The next comment states: "PC Denied. Listed offender nicknames are not sufficient to locate the source of the threat." [*Id.*]. An MCF Unit Team Manager then sent an Inter-Departmental Memorandum to the Warden on January 2, 2020, reporting that Mr. Downey had requested protective custody and that his request had been reviewed

by the Unit Team Manager with help from in unit staff and other personnel. The Memorandum also reported that Mr. Downey "alleges the Aryan Brotherhood and the Folks have a hit on him. He only provides nicknames in his request. He does not provide any additional information for review." [DE 97-3]. The Memorandum also states that he "fails to provide specific information to investigate his allegations to include names, times or statements of threat. The nicknames provided could not be tied to any known offender at this time." [*Id.*]. The Memorandum concludes by stating that the committee accordingly denied the request for protection.

An MCF staff member met with Mr. Downey face to face on March 25, 2025, to ask if "things were going okay" and whether he had questions or concerns. [DE 97-4 at 1]. IDOC Case Notes show that Mr. Downey told the employee that he was upset about his tablet being stolen and that he had to pay for it. Mr. Downey also asked about his visitation list, and he was told that he had no one approved for visits and that he should contact another employee to change that. [*Id.*]. Mr. Downey concedes that he stated these things but maintains that he did so with "big eyes" to let the employee know that nothing was okay. [DE 106-2 at 2, ¶¶ 10, 10a]. Mr. Downey did not speak to the Warden directly, and nothing in the case notes show that the Warden knew about the face-to-face meeting. [DE 106-2 at 2, ¶¶13, 13a.; DE 97-4].

The next day—March 26, 2020—Mr. Downey was attacked, and he had to go to the infirmary. Mr. Downey did not know the offenders involved in the attack, but he contends that they were all from the Aryan Brotherhood.

### 2.    Second Attack – August 4, 2020

Mr. Downey was attacked again on August 4, 2020. Prior to the incident, on June 15, 2020, Mr. Downey's mother called MCF stating that she was concerned for his safety because of a debt. An MCF employee met with Mr. Downey that same day. Case notes from the face-to-face visit state that Mr. Downey acted "shocked" at this statement and that he claimed this conversation with his mother never happened. [DE 106-2 at 3, ¶15]. Mr. Downey denies that he said this. [*Id.* ¶15a]. The MCF employee also asked him if he felt like he was in danger, and the employee reports that Mr. Downey responded "No, where would anyone get that." [*Id.*]. Mr. Downey again denies the content of this conversation. [*Id.*]. The case notes do not show that Warden Hyatte received or was otherwise aware of the call from Mr. Downey's mother. [DE 97-4].

Moreover, on July 17, 2020, Mr. Downey's attorney, Judd McMillin, emailed the Warden's secretary at that time, Robin Burton. In his email, Attorney McMillin stated that while Mr. Downey was moving to a new dorm, a group of inmates—inmates that Mr. Downey feared—came into his room. Attorney McMillin explained that the inmates had told Mr. Downey that they would find out where he was going and would have individuals at the next location prepared to harm him upon his arrival there. [DE 106-2 at 3, ¶¶15, 15a]. The email did not state the names of these inmates or share purported organizational affiliations. Still, Attorney McMillan stated that if IDOC would "review the video footage of 319 in the K Dorm between the times and [sic] 9:00 A.M. and 9:45 A.M. on July 17, 2020, you will see these individuals come to tell him of this." [DE 97-5

at 1]. Attorney McMillin also stated that "the inmate who works in the 'bubble' is working with these other inmates to make sure that Mr. Downey's location is known to those who seek to do him harm." [*Id.*].

The Warden does not specifically recall this email but maintains that Ms. Burton "would have probably come and said she received a call and it was sent to I&I, just to let me know that it was forwarded appropriately." [DE 106-2 at 5]. Ms. Burton's email forwarding the information to IDOC internal investigators states that "Mr. Hyatte asked me to forward this to you. They are moving [Mr. Downey] to D today" and shows that the Warden was CC'ed. [DE 97-5 at 1].

Mr. Downey was then moved to a new unit next to the one he was previously housed in. [DE 106-2 at 2, ¶¶19, 19a]. Mr. Downey was assaulted approximately two weeks later, on August 4, 2020, and he had to go the infirmary. [*Id.* ¶¶21, 21a]. The Warden was notified in writing of Mr. Downey's assaults. [*Id.* at 4, ¶4].

## B.    Discussion

### 1.    Legal Standards

Summary judgment is appropriate when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "Only

disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore,* 351 F.3d 278, 282 (7th Cir. 2003).

To overcome a motion for summary judgment, the nonmoving party cannot rest on the mere allegations or denials contained in its pleadings. Rather, the nonmoving party must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. *Celotex,* 477 U.S. at 322–23; *Modrowski v. Pigatto,* 712 F.3d 1166, 1168 (7th Cir. 2013) Where a factual record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). In other words, "[s]ummary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory,* 407 F.3d 852, 859 (7th Cir. 2005) (quotations omitted); *see also Goodman v. Nat'l Sec. Agency, Inc.,* 621 F.3d 651, 654 (7th Cir. 2010).

Mr. Downey alleges that Warden Hyatte violated the Eighth Amendment by failing to protect him from the attacks that occurred in March and August of 2020. Warden Hyatte has moved for summary judgment contending that the undisputed

material facts show that there was no violation of Mr. Downey's constitutional rights. The Warden also maintains that he is entitled to qualified immunity.

The doctrine of qualified immunity protects government officials from liability for civil damages when their conduct does not violate a "clearly established" constitutional or statutory right. *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010). Once a defendant raises a qualified immunity defense, the plaintiff carries the burden of defeating it. *Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 359 (7th Cir. 2005). Evaluating this defense requires the Court to make two inquiries: (1) whether the facts—which the Court views in the light most favorable to Plaintiff—show a violation of a statutory or constitutional right, and (2) whether that right was "clearly established" at the time of the alleged violation. *Williams v. Chicago*, 733 F.3d 749, 758 (7th Cir. 2013). "If *either* inquiry is answered in the negative, the defendant official is entitled to summary judgment." *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014) (emphasis in original).

The Court need not address the prongs in this order; instead, the Court may address the prongs in the order "best suited to the circumstances of the particular case at hand." *McAllister*, 615 F.3d at 881. Here, it makes sense to address the prongs in order, as the Warden's primary argument is that no constitutional violation occurred. Accordingly, the Court begins by considering whether the facts, viewed in the light most favorable to Mr. Downey, show a violation of his constitutional rights.

### 2.    Eighth Amendment Failure to Protect Claim

Mr. Downey is proceeding with a failure to protect claim under the Eighth Amendment, which he brings through 42 U.S.C. § 1983. *See Rossi v. City of Chi.*, 790 F.3d 729, 734 ("Rather than acting as a source of rights, § 1983 serves as a vehicle for 'vindicating federal rights elsewhere conferred.'") (quoting *Graham v. Connor*, 490 U.S. 386, 393–94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

The Eighth Amendment imposes a duty on prison officials "to take reasonable measures to guarantee the safety of inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). As part of this duty, "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Id.* at 833. However, "prisons are dangerous places," as "[i]nmates get there by violent acts, and many prisoners have a propensity to commit more." *Grieveson v. Anderson*, 538 F.3d 763, 777 (7th Cir. 2008). Therefore, a failure-to-protect claim cannot be predicated "merely on knowledge of general risks of violence in a detention facility." *Brown v. Budz*, 398 F.3d 904, 913 (7th Cir. 2005). Instead, the evidence must show that "the defendant had actual knowledge of an impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." *Santiago v. Wells*, 599 F.3d 749, 756 (7th Cir. 2010).

Thus, it is a prison official's "deliberate indifference" to an inmate's substantial risk of serious harm that violates the Eighth Amendment. *Id.* at 828. Mr. Downey must first show he was "incarcerated under conditions posing a substantial risk of serious

harm" and second, that Warden Hyatte acted with "deliberate indifference" to his safety. *Farmer*, 511 U.S. at 834. The Court addresses the evidence for each prong in turn.

### a.    Serious Harm

First, "the harm to which the prisoner was exposed must be an objectively serious one[.]" *Sinn v. Lemmon*, 911 F.3d 412, 419 (7th Cir. 2018) (quoting *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (internal quotation marks omitted)). It "requires more than a generalized risk of harm." *Morris v. Ley*, 331 F. App'x 417 (7th Cir. 2009). In the context of failure to protect cases, the Seventh Circuit has equated "substantial risk" to "risks so great that they are almost certain to materialize if nothing is done." *Brown*, 398 F.3d at 911.

Warden Hyatte does not appear to contest that Mr. Downey was exposed to an objectively serious harm. [*See* DE 97 at 1, ¶2]. Accordingly, the Court finds that Mr. Downey has satisfied this component of his claim. *See, e.g.*, *Brown*, 398 F.3d at 910 ("a beating suffered at the hands of a fellow detainee . . . clearly constitutes serious harm"); *see also Moore v. Herr*, No. 3:19-CV-479-JD-MGG, 2021 WL 4169593, at *2 (N.D. Ind. Sept. 14, 2021) ("There is no dispute that the threat about which [Plaintiff] complained (being assaulted by another prisoner) meets this criterion.").

### b.    Deliberate Indifference

At issue is the second, subjective component of Mr. Downey's claim. As to this, a prison official must be both (1) "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and (2) "draw the inference." *Farmer*, 511

U.S. at 837. Deliberate indifference requires more than mere negligence—it requires a conscious disregard or recklessness. *Id.* at 839. Put another way, deliberate indifference is a high standard and is "something approaching a total unconcern for a prisoner's welfare in the face of serious risks," or a "conscious, culpable refusal" to prevent harm. *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992).

Though "this inquiry focuses on an official's subjective knowledge, a prisoner need not present direct evidence of the official's state of mind." *Gevas*, 798 F.3d at 480. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842, 114 S. Ct. 1970. Prisoners often show an inference of actual knowledge by complaining to prison officials about a specific threat to their safety. *Gevas*, 798 F.3d at 480. Whether a complaint shows a specific threat is a fact specific inquiry. "Complaints that convey only a generalized, vague, or stale concern about one's safety will not support an inference that a prison official had actual knowledge that the prisoner was in danger." *Id.* at 480-81; *see Klebanowski v. Sheahan*, 540 F.3d 633, 640 (7th Cir. 2008) (upholding summary judgment for defendant where inmate's complaint stated that he "had been involved in an altercation with three other inmates, and that he wanted a transfer because he feared for his life" but failed to mention that "he had actually been threatened with future violence" or that the prior attack "was inflicted by gang members because of his non-gang status"); *see also Grieveson*, 538 F.3d at 776 (upholding summary judgment for defendant where inmate

stated only that he was afraid and wanted to move, failing to mention that "he was at risk because of his 'snitch' reputation").

On the other hand, a complaint "that identifies a specific, credible, and imminent risk of harm and identifies the prospective assailant typically will support the inference that the official to whom the complaint was communicated had actual knowledge of the risk." *Gevas,* 798 F.3d at 481. In that instance, a failure to take reasonable responsive actions amounts to deliberate indifference. *LaBrec v. Walker*, 948 F.3d 836, 847 (7th Cir. 2010). Still, "prison officials who actually knew of a substantial risk to inmate health or safety can nevertheless escape liability if they responded reasonably to the risk, whether or not the harm was ultimately averted." *Id.* 841 (7th Cir. 2010) (citing *Farmer*, 511 U.S. at 844-45).

The Court now turns to the parties' arguments. The Warden contends that the undisputed facts show that he was not deliberately indifferent because he cannot be held liable for the actions of the committee who denied Mr. Downey's requests. Moreover, the Warden contends that, based on the information provided by Mr. Downey in these requests, the Warden did not have knowledge of a specific threat of harm to Mr. Downey. As stated, before the attack in March 2020, Mr. Downey submitted three requests for protection: one on October 2, 2019; another on October 26, 2019; and a third on December 30, 2019.[3] The Warden contends that the requests for protective custody failed to put him on notice of a specific threat because they failed to

---

[3] Mr. Downey also met face to face with prison staff the day before the attack occurred, but no evidence shows that the Warden was ever made aware of this meeting.

mention specific offender names. [DE 98 at 6]. Prior to the second attack in August 2020, Mr. Downey's mother and his attorney both contacted MCF, although evidence shows that the Warden only received the email from Mr. Downey's attorney. The Warden contends that the email failed to provide him actual knowledge of a specific threat to Mr. Downey's safety because the email did not name any specific inmates or provide any information regarding where the threatening inmates lived. [*Id.* at 7]. The Warden also contends that he also acted reasonably in response to the information in the email.

Mr. Downey concedes that his first two requests for protective custody (submitted in October 2019) were "somewhat vague and/or stale." [DE 100 at 5]. But Mr. Downey contends that his December 2019 request for protective custody and the email sent by his attorney, Judd McMillin, were not vague or stale, and therefore support an inference that the Warden had knowledge of a specific threat to his safety. [*See* DE 100 at 5].[4]

### i. December 2019 Request for Protective Custody

At the outset, the Warden maintains that he cannot be liable for the denial of Mr. Downey's protective custody requests because they were decided by a committee, relying on *Hoban v. Godinez*, 502 F. App'x 574, 578 (7th Cir. 2012) (unpublished). There, the court stated that "top-level administrators are entitled to relegate to others . . . the primary responsibility for specific prison functions without becoming vicariously liable

---

[4] As stated *supra*, summary judgment is the "put up or shut up moment in a lawsuit." *Hammel*, 407 F.3d at 859. The December 2019 request and the July 2020 email are the only evidence Mr. Downey "puts up" to support an inference that the Warden had knowledge of a specific threat to his safety. Accordingly, this is the only evidence discussed by the Court here.

for the failings of their subordinates." *Id.* Mr. Downey disputes the applicability of *Hoban* here, contending that the evidence shows that the Warden was responsible for final determinations regarding protective custody.

"[T]he Supreme Court has foreclosed *respondeat superior* liability for section 1983 actions, [so] a plaintiff may hold a government official liable only for his or her own misconduct." *See Kemp v. Fulton Cnty.*, 27 F. 4th 491, 497-98 (7th Cir. 2022). Moreover, "the fact that an inmate sought and was denied protective custody is not dispositive of the fact that prison officials were therefore deliberately indifferent to his safety." *Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997). Mr. Downey is not proceeding against the Warden on a claim of vicarious liability, and the Court is not considering his claim as such. Rather, the Court is considering evidence of the Warden's knowledge and his response to the risks Mr. Downey reported to determine whether this supports an inference that the Warden was deliberately indifferent. Thus, the holding in *Hoban* is not the salient inquiry.

The Court now considers the substance of Mr. Downey's request for protection, which was undisputably received by the Warden. [DE 106-2 at 2, ¶¶13, 13a; at 4, ¶3]. In his December 2019 request for protective custody, Mr. Downey reported that there was a hit on him to kill him. It is undisputed that Mr. Downey did not name a potential assailant in the request. While it is true that deliberate indifference can often be found when officials "know of threats . . . posed by a *specific source*" the court is "not constrained by this fact pattern." *Brown*, 398 F.3d at 915 (emphasis in original). Indeed,

"[i]t is well settled that deliberate indifference may be found though the specific identity of the ultimate assailant is not known before the assault." *Id.* Therefore, instead of focusing only on whether Mr. Downey's request named a potential assailant, the Court "must consider the context of the perceived threat as a whole, and whether the evidence, circumstantial, documentary or otherwise, was sufficient to indicate that the officials were aware of the substantial risk." *Labrec*, 948 F.3d at 843. The Court must therefore determine whether Mr. Downey reported a "specific, imminent, and plausible threat to his safety." *Moore*, 2021 WL 4169593, at *4.

In his December 2019 request for protective custody, Mr. Downey identified nicknames of two potential assailants and provided the names of the two gangs in which they were affiliated. He also explained that he had bed numbers and other identifying information, though he did not provide them on the form. [*See* 97-3 at 3, stating that "I have phone numbers also Transactions Numbers"]. Mr. Downey also stated that these inmates were "demanding money due to [his] case." [*Id.* at 2]. Thus, Mr. Downey "identified the nature of the threat"—here, a hit to kill him; and "supplied context that rendered the threat plausible"—a debt. *See id.* He also gave some identifying information for the potential assailants—nicknames and gang affiliation. This information, considered alone, is close. Construing these facts and inferences in Mr. Downey's favor, a reasonable jury could find that his December 2019 request supports the inference that the Warden had knowledge of a specific threat to his safety. *See Moore*, 2021 WL 4169593, at *4 (denying correctional officers' motion for summary

19

judgment where inmate told them that he had received threats of physical beating and death, and the inmate provided them with nicknames of potential assailants, real last names for two assailants, the assailants' gang affiliation, and a reason for the threats).

But this is not the only information Warden knew about when he received the request for protective custody. When Warden Hyatte learned about Mr. Downey's request, MCF staff had already ordered Mr. Downey "to remain in [his] assigned cell and await further review by I&I unit team." [DE 97-3 at 2]. Moreover, the staff member's communication to the Warden relayed that Mr. Downey's request was subsequently denied because the nicknames were insufficient to locate the source of the threat—specifically, "[t]he nicknames provided could not be tied to any known offender at this time." [*Id.* at 1]. Thus, when the Warden learned of Mr. Downey's request, he also learned that the information Mr. Downey provided could not be verified, lessening the plausibility of Mr. Downey's claims of ongoing or imminent threats to his safety. Based on all the information surrounding Mr. Downey's request by the time the Warden received it, a reasonable jury would not find that the request supports an inference that the Warden recognized a substantial risk of serious harm.

### ii.    July 2020 Email from Mr. Downey's Attorney

The Court next considers whether the information provided by Mr. Downey's attorney showed "a specific, imminent and plausible threat" to Mr. Downey's safety. *Moore*, 2021 WL 4169593, at *4. Attorney McMillin's email reported that a group of inmates that Mr. Downey is fearful of came to his dorm and told him that they would

have individuals ready to harm him after he moved locations. [DE 97-5]. Though Mr.
Downey's attorney did not identify the other inmates by name or by gang association,
Attorney McMillin provided the timeframe of the threatening inmates' visit to Mr.
Downey's cell and maintained that it could be verified upon review of video
surveillance. He likewise explained that another unnamed inmate could find out Mr.
Downey's new location. The email provided that this unnamed inmate worked in the
"bubble" and was working with the other inmates seeking to harm Mr. Downey.

Whether the email presents a specific, imminent, and plausible threat of harm is
close. Though the email shows that Mr. Downey feared these inmates and that the
inmates threatened to have others harm him after he moved to another dorm, there is
no information about the nature of the harm or why these inmates sought to harm him.
Mr. Downey's attorney does not request protective custody or make any other specific
requests, instead stating that "I am providing this to you so you have all information
available as you consider how to best address the situation." [DE 97-5]. Still, other
information in the email gives credence to his claim of ongoing harm, such as the
narrow timeframe of the visit and the specific information about the involvement of the
inmate from the "bubble." Mr. Downey had also been attacked four months earlier, and
the Warden had been notified, in writing, of Mr. Downey's prior assault. [DE 106-2 at 4,
¶4.] *See Labrec*, 948 F.3d at 843 (observing that the court must consider the overall
context of an inmate's report of a threat).

But the inquiry does not end there. "Because a prison official's duty under the Eighth Amendment is to ensure 'reasonable safety,' prison officials who actually knew of a substantial risk to inmate health or safety can nevertheless escape liability if they responded reasonably to the risk, whether or not the harm was ultimately averted." *Id. at 841*. The Warden contends that he acted in response to this email by proceeding with Mr. Downey's move to a new dorm and by having his secretary forward the email to MCF internal investigators so that they would be aware of Mr. Downey's concerns and new location. [DE 98 at 8; DE 105 at 4]. Mr. Downey does not contest that the Warden acted in response to this complaint. Failure to address an argument in response to summary judgment generally results in waiver. *Betco Corp., Ltd. v. Peacock*, 876 F.3d 306, 309 (7th Cir. 2017); *see also Walton v. U.S. Steel Corp.*, 497 F. App'x 651, 655 (7th Cir. 2012). Moreover, even construing the facts and reasonable inferences in Mr. Downey's favor, a jury could not find that the Warden ignored Mr. Downey's safety here. "[T]he mere failure of the prison official to choose the best course of action does not amount to a constitutional violation." *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002). The Warden's actions—at most—suggest poor judgment, and "[e]xercising poor judgment . . . falls short of meeting the standard of consciously disregarding a known risk to [an inmate's] safety." *Lewis*, 107 F.3d at 554. Rather, "proving deliberate indifference 'requires more than a showing of negligent or even grossly negligent behavior . . . . [Defendant] must have acted with the equivalent of criminal recklessness." *Grieveson,*

538 F.3d at 775 (internal citation omitted). Without more from Mr. Downey, the Court cannot find that the evidence supports more than poor judgment or negligence.

In sum, the undisputed material facts, even when construed in Mr. Downey's favor, do not support an inference that Mr. Downey's December 2019 protective custody request put the Warden on notice of a specific threat to his safety or that the Warden failed to take reasonable action in response to the July 2020 email sent by Mr. Downey's attorney. Accordingly, the Warden is entitled to summary judgment on Mr. Downey's claim.

## III.    Conclusion

For these reasons, the Court now

- **GRANTS** Mr. Downey's Unopposed Motion for Leave to Amend His Response to Defendant's Motion for Summary Judgment [DE 106]. The Clerk is **DIRECTED** to docket Mr. Downey's proposed Designation of Materials [DE 106-1] and his proposed Response to Defendant's Statement of Material Facts [DE 106-2]; and

- **GRANTS** Defendant William Hyatte's Motion for Summary Judgment. [DE 97].

**SO ORDERED** this 25th day of March 2025.

s/Scott J. Frankel
_____
Scott J. Frankel
United States Magistrate Judge